**S & A FARMS, INC., Plaintiff,**

v.

**FARMS.COM, INC., a North Carolina Corporation and Farms.Com Risk Management, Ltd., a Canadian Federal Corporation, Defendants.**

No. 4:09–cv–497.

United States District Court,
S.D. Iowa,
Central Division.

June 17, 2011.

Gail E. Boliver, Boliver & Bidwell Law Firm, Marshalltown, IA, William J. Bolotin, Doyle & Bolotin Ltd., Chicago, IL, Brian P. Rickert, Brown Winick Graves Gross Baskerville & Schoenebaum PLC, Bridget R. Penick, Richard A. Malm, Dickinson Mackaman Tyler & Hagen PC, Des Moines, IA, for Defendants.

Brant D. Kahler, Brian P. Rickert, Brown Winick Graves Gross Baskerville & Schoenebaum PLC, Des Moines, IA, for Defendants.

## ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court is a Motion for Summary Judgment, filed on March 11, 2011

by Farms.com Risk Management, Ltd. ("Defendant").[1] Clerk's No. 39. S & A Farms, Inc. ("Plaintiff") filed a resistance to the Motion on April 1, 2011. Clerk's No. 42. Defendant filed a Reply on April 8, 2011. Clerk's No. 43. The matter is fully submitted.

## I. FACTUAL BACKGROUND

Plaintiff is an Iowa corporation that is in the business of producing corn and both producing and selling soybeans and hogs. Def.'s Statement of Material Facts in Support of Mot. for Summ. J. (hereinafter "Def.'s Facts") ¶¶ 1, 4; Pl.'s Resp. to Def.'s Facts ¶ 4. It was formed in 1992 by Scott Renaud ("Renaud") and Abbie Renaud (collectively "the Renauds"), who are its sole officers, directors, and shareholders. Def.'s Facts ¶ 2. Renaud is the Plaintiff's sole employee. Id. ¶ 3. Renaud did not attend college, other than two eight-week programs for farmers. Pl.'s Statement of Material Facts in Resp. to Def.'s Mot. for Summ. J. (hereinafter "Pl.'s Facts") ¶ 33. He did not have any formal training in hedging or risk management techniques, but had been involved in—and had prior experience with—commodities trading with three different brokers in years prior to 2007. Id.; Def.'s Resp. to Pl.'s Facts ¶ 33.

At some point in time, Howard Vroom ("Vroom"), a local feed salesman, intro-duced Renaud to Victor Aideyan ("Aideyan"),[2] the Senior Consultant/Manager for Defendant. Def.'s Facts ¶ 5. In a brochure, Defendant stated that it was "an agricultural commodity marketing and price risk management service provider for farmers, producers and agribusiness across North America." Pl.'s Facts ¶ 1. In marketing materials, Aideyan was listed as a "Senior Risk Management Consultant" on Defendant's "Risk Management Team," with "over 14 years experience in commodity trading and marketing." Id. ¶ 4.

In September 2007, Vroom arranged a meeting at Defendant's Ames, Iowa office between Renaud, Aideyan, and Jack Ticky ("Ticky"), another employee of Defendant. Def.'s Facts ¶ 6. In attending this meeting, Renaud advised Aideyan that Plaintiff was increasing the size of its hog production and needed risk management advice. Pl.'s Facts ¶ 8. Renaud wanted Aideyan and Ticky to explain how Defendant could help provide risk management services in relation to the corn he purchased to feed Plaintiff's hogs.[3] Def.'s Facts ¶ 7. On September 17, 2007, Aideyan and Renaud executed a Price Risk Management Service Letter (hereinafter the "Contract"), wherein Defendant agreed to provide, and Plaintiff agreed to purchase, consulting services related to the corn inputs and hog outputs involved in Plaintiff's operation.[4] Id. ¶ 11.

---

1. The Motion for Summary Judgment was also filed on behalf of Farms.com, Inc. See Clerk's No. 39. In its response to the Motion, however, Plaintiff agrees that Farms.com, Inc. should be dismissed from this action. See Clerk's No. 42 at 2 ("Plaintiff does not oppose dismissal of its claims against Farms. com, Inc.").

2. Aideyan has a master's degree in business administration and a derivative market specialist designation from the Canadian Securities Institute. Pl.'s Facts ¶ 5. He is a certified member of the Canadian Association of Farm Advisors. Id.

3. Plaintiff contends that during the September 2007 meeting, Aideyan described himself as an expert in the use of futures and options for risk management purposes and assured Renaud that he would leave speculation to gamblers. Pl.'s Facts ¶ 9. Defendant denies this assertion. Def.'s Resp. to Pl.'s Facts ¶ 9.

4. Plaintiff notes that the Contract listed Farms.com Risk Management, as opposed to Farms.com Risk Management Ltd. as a party, and that Renaud only "assumes" he executed the Contract. Pl.'s Resp. to Def.'s Facts ¶ 11.

On September 19, 2007, Defendant sent an invoice to the Renauds requesting payment in the amount of $2,000.00, in relation to "Risk Management Services and Consulting for Hogs and Inputs" for the period September 17, 2007 to March 17, 2008. *Id.* ¶ 13; Pl.'s Facts ¶ 10. Plaintiff paid the invoice, via a check made out to "Farms.com Risk Management," on September 20, 2007. Def.'s Facts ¶ 14. Also on September 20, 2007, Aideyan sent an External Memorandum to the Renauds, outlining in more detail the services that Defendant would be providing. *Id.* ¶ 12. On March 27, 2008, Aideyan sent another invoice to the Renauds, requesting payment in the amount of $4,000.00, for Defendant's "Elite Service Hog Program," for the period of March 17, 2008 to March 17, 2009. *Id.* ¶ 15; Pl.'s Facts ¶ 11. Plaintiff paid the invoice, via a check made out to "Farms.com Risk Management," on April 10, 2008. Def.'s Facts ¶ 16.

Shortly after the September 2007 meeting between Renaud, Aideyan, and Ticky, Renaud established and opened a commodities trading account with MF Global, Inc. ("MF Global").[5] *Id.* ¶ 17. Only Renaud was authorized to make trades in the MF Global account. *Id.* ¶ 18. Thus, after discussing potential trades and positions with Aideyan, Renaud would call MF Global and execute trades. *Id.* ¶ 19. On occasion, Aideyan would either contact MF Global in advance, or participate in the calls to MF Global to ensure that Renaud accurately communicated Plaintiff's desired trade. *Id.;* Pl.'s Facts ¶¶ 23–24. In September 2008, Aideyan left his employment with Defendant. Def.'s Facts ¶ 20. Thereafter, Maurizo Agostino ("Agostino") provided services to Plaintiff.[6] *Id.* ¶ 21.

Renaud, at times, provided copies of Plaintiff's MF Global account statements so that Aideyan could monitor the trades made on the account. Pl.'s Facts ¶ 22; Def.'s Resp. to Pl.'s Facts ¶ 22. Aideyan acknowledged in his deposition that he regularly discussed trades with Renaud and that the trading strategy reflected in the MF Global account was the strategy developed by Defendant.[7] Pl.'s Facts ¶ 18. All of the trades reflected in Plaintiff's MF Global account, save for one cotton trade on October 21, 2008, were recommended to Renaud by either Aideyan or Agostino.[8] *Id.* ¶ 21; Def.'s Resp. to Pl.'s Facts ¶ 21.

On February 24, 2009, Plaintiff unilaterally liquidated its positions and stopped obtaining and relying on advice from Defendant. *Id.* ¶ 23. Between September 20, 2007 and February 24, 2009, Plaintiff's ac-

---

5. Plaintiff contends that Aideyan recommended that Plaintiff open a commodity trading account with MF Global. Pl.'s Facts ¶ 15. Defendant, however, avers that Aideyan recommended several potential brokerages to Renaud, and that Renaud chose MF Global because he already had an account open with that firm. Def.'s Resp. to Pl.'s Facts ¶ 15. All references in this Order to the MF Global account are to the account that Renaud opened with MF Global *after* his meeting with Aideyan, not to any account opened prior to that time.

6. Agostino was identified in Defendant's marketing materials as a "Senior Risk Management Consultant" who has "obtained his U.S. Series 3 Futures and Options License Course." Pl.'s Facts ¶ 6.

7. Defendant's trading advice and recommendations were intended as hedges for risk management purposes. Pl.'s Facts ¶ 30.

8. According to Defendant, Agostino rendered little "advice" to Plaintiff because Agostino only spoke to Renaud a few times. *See* Def.'s Resp. to Pl.'s Facts ¶¶ 25–26, 29 Defendant contends that in their second or third conversation, Renaud advised Agostino that he was going to sue Defendant and Agostino. *Id.* Agostino, thereafter, refused to give advice to Renaud regarding Plaintiff's account with MF Global. *Id.*

count with MF Global incurred a net loss of $1,040,958.75. Pl.'s Facts ¶ 28.

On December 8, 2009, Plaintiff filed a Complaint in this Court alleging that Defendant is liable to Plaintiff for violating the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 et seq. *See* Compl. ¶¶ 16–26. Specifically, Plaintiff claims that Defendant failed to disclose that it was required to register with the Commodity Futures Trading Commission ("CFTC"), but had not so registered, and additionally failed to disclose its trading experience and other material information required by the CFTC regulations.[9] *Id.* ¶¶ 23–24. According to Plaintiff, had it known that Defendant was operating in violation of the CEA, it never would have done business with Defendant. *Id.* ¶ 23. Plaintiff further asserts claims against Defendant under Iowa law for breach of fiduciary duty, negligence, and misrepresentation. *Id.* ¶¶ 27–51.

## II. STANDARD FOR SUMMARY JUDGMENT

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[10] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[11] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."[12] "[S]ummary judgment is an

---

**9.** Defendant does not dispute that it has never been registered with CFTC or the National Futures Association ("NFA"), and never consulted an attorney to determine whether it was required to register as a commodity trading advisor. Pl.'s Facts ¶¶ 34–35. Defendant also does not dispute that neither Aideyan nor Agostino have ever been registered in any capacity in the United States, or that Defendant advised more than 15 persons in its Elite Service Hog Program. *Id.* ¶¶ 36–38. While Defendant admits that it did not advise Plaintiff of its lack of registration with the CFTC, it denies that it was required to be registered with the CFTC in the first instance. *See* Def.'s Resp. to Pl.'s Facts ¶ 39; Def.'s Br. at 6 n. 3.

**10.** Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

**11.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

**12.** Federal Rule of Civil Procedure 56 was revised effective December 1, 2010. The revised rule does not change the substantive standard for summary judgment. *See* Fed.

extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of

R.Civ.P. 56 advisory committee's note ("Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged."); *see also*

*Seacor Holdings, Inc. v. Commonwealth Ins. Co.,* 635 F.3d 675, 680 n. 8 (5th Cir.2011) ("The amended rule contains no substantive change to the standard."). All references in this Order to Rule 56 refer to the current version of the rule, unless otherwise noted.

*some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the non-moving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed.1998)).

### III. LAW AND ANALYSIS

#### A. *Plaintiff's Claim for Commodity Exchange Act Violation*

The CEA provides, in pertinent part:

(1) Any person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person—

(A) who received trading advice from such person for a fee.

7 U.S.C. § 25(a)(1). Thus, to prevail on its claim against Defendant for a CEA violation, Plaintiff must demonstrate, among other things, that Defendant violated a provision of the CEA and that Plaintiff sustained "actual damages" that were "caused by such violation" when it received trading advice from Defendant for a fee.

■ According to Count I of Plaintiff's Complaint, Defendant violated the CEA by failing to register with the CFTC as a commodity trading advisor ("CTA").[13] Compl. ¶ 18. Plaintiff contends that it "has established all elements of a private right of action under the CEA." Pl.'s Br. at 3. Specifically, Plaintiff alleges that "[Defendant] violated Section 4o(1) of the CEA, 7 U.S.C. § 6o(1),[14] which prohibits fraud by a commodity trading advisor. [Plaintiff] received trading advice from [Defen-

---

**13.** Subject to certain exceptions, the CEA defines a "commodity trading advisor" as any person who:
(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in—
(I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market or derivatives transaction execution facility;

(II) any commodity option authorized under section 6c of this title; or
(III) any leverage transaction authorized under section 23 of this title; or
(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i).
7 U.S.C. § 1a(6)(A).

**14.** Section 4o(1) of the CEA provides:
(1) It shall be unlawful for a commodity trading advisor, associated person of a

dant] for a fee and incurred actual damages from receiving that trading advice." *Id.* Though Defendant denies that it was required to register as a CTA, *see* Def.'s Br. at 6 n. 3, its Motion for Summary Judgment does not focus on the legal requirement of registration. Rather, Defendant argues that, "[r]egardless of whether Plaintiff would be able to establish that Defendant violated the CEA by failing to register as a CTA with the CFTC, Plaintiff will not be able to provide that such violation caused it 'actual damages.'" Def.'s Br. at 7. Defendant cites *Ping He (Hai Nam) Co. Ltd. v. NonFerrous Metals (U.S.A.) Inc.* in support of its position. *See* 22 F.Supp.2d 94 (S.D.N.Y.1998), *vacated in part on other grounds by* 187 F.R.D. 121 (S.D.N.Y.1999).

In that case, Ping He sought the return of $350,000 it had deposited into a commodity trading futures account with Non-Ferrous Metals (U.S.A.) Inc. ("NFM"), alleging that NFM had violated the CEA in various ways, including by failing to register as a futures commission merchant ("FCM") under § 4d of the CEA. *See* 22 F.Supp.2d at 99; 7 U.S.C. § 6d. The district court rejected Ping He's § 4d claim, finding:

> Ping He offers no evidence or basis for believing that it incurred damages simply by dealing with an unregistered

FCM. As a logical matter, it is unlikely that any private litigant could show 'actual damages' flowing from a § 4d violation because, as courts and the CFTC have recognized, an FCM's unregistered status, in and of itself, does not cause another financial damage. *See Marshall v. Green Giant Co.,* 942 F.2d 539, 546 (8th Cir.1991) ("A party does not suffer damage merely by dealing with an unregistered FCM; failure to register, without more, does not cause pecuniary loss."); *Hofmayer v. Dean Witter & Co., Inc.,* 459 F.Supp. 733, 739 & n. 4 (N.D.Cal.1978) ("[t]he mere failure to register does not amount to fraud, deceit or misrepresentation sufficient to justify rescission.... [A] causal connection between the failure to register and the damage would have to be alleged."); *Hall v. Paine Webber Jackson & Curtis, Inc.,* [1986–1987 Transfer Binder] Comm. Fut. L. Rep (CCH) ¶ 23,317, at 32,890 n. 4 (Oct. 8, 1986) (customer's damages were not proximately caused by violation of registration provision).

22 F.Supp.2d at 108.

Plaintiff counters that the quoted language from *Ping He* does nothing to defeat its case because the court recognized that, "[i]f Ping He can assert any damages claim based upon NFM's unregistered status, it is one under § 4b [15] of [the CEA],

---

commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1).

**15.** Section 4b of the CEA provides:
> (a) Unlawful actions
> It shall be unlawful—
> (1) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person; or
> (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and

on the grounds that NFM fraudulently induced it to open a futures trading account by misrepresenting or concealing its unregistered status." *Id.* at 109. According to *Ping He,* "[c]ast as a fraudulent inducement claim, there is a causal link between NFM's alleged violation of the statute and Ping He's out-of-pocket losses because, the argument goes, 'but for' NFM's misrepresentation or concealment of its unregistered status, a material fact, Ping He would not have opened the account with NFM and would not have incurred any losses." *Id.* (noting that the CFTC "has repeatedly endorsed this analytical approach in § 14 reparations proceedings").

■ Even assuming that Plaintiff has adequately pleaded a fraudulent inducement claim,[16] the Court finds summary judgment in favor of Defendant appropriate. To prove a case for fraudulent inducement, Plaintiff must prove that Defendant: 1) acted with scienter;[17] 2) made a

---

(2) of section 7a(g) of this title, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—   .   .

    (A) to cheat or defraud or attempt to cheat or defraud the other person;

    (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

    (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person; . . . .

7 U.S.C. § 6b.

**16.** Defendant vehemently argues that *Ping He* does not support Plaintiff's claim because Plaintiff has *always* asserted that its damages arise under 7 U.S.C. § 6*o*(1)(B), and has *never,* until its resistance to Defendant's Motion, claimed that its damages arise under 7 U.S.C. § 6b. *See* Def.'s Reply at 1–2 ("[R]ealizing that the holding in [*Ping He* ] does not support Plaintiff's claim for damages arising out of violation of 7 U.S.C. § 6*o*(1)(B), Plaintiff slyly attempted to convert its 7 U.S.C. § 6*o*(1)(B) fraud claim into a fraudulent inducement claim pursuant to 7 U.S.C. § 6b, an entirely different provision of the CEA that Plaintiff has never plead, referenced or disclosed."). The Court agrees that Plaintiff appears to have never before referenced § 4b, the typical vehicle for a claim of fraudulent inducement.

*E.g., Bartel v. Prudential–Bache,* CFTC No. 86–R158, 1988 WL 228764 (July 7, 1988) ("The Commission has previously recognized that, in certain circumstances, a broker's failure to disclose his registration status to a customer violates Section 4b of the Act."). Indeed, the allegations of Plaintiff's Complaint do not employ the term "fraudulent inducement"; rather, they explicitly track the statutory fraud language of § 6*o*(1), not the language of § 6b. *Compare* Compl. ¶ 21 ("Defendants employed devices, scheme or artifice to defraud S & A.") *and* ¶ 22 ("Defendants engaged in a transaction practice or cause [sic] of business which operated as a fraud or deceit upon S & A.") *with* 7 U.S.C. § 6*o*(1)(A)-(B) (stating it is unlawful for a CTA to use means of interstate commerce to "employ any device, scheme, or artifice to defraud" or to "engage in any transaction, practice, or course of business which operates as a fraud or deceit") *and* 7 U.S.C. § 6b(a) (stating it is unlawful for any person "in connection with" the making of a contract of sale of any commodity to "cheat or defraud" or "willfully to deceive or attempt to deceive the other person."). The Federal Rules of Civil Procedure "do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *N. States Power Co. v. Fed. Transit Admin.,* 358 F.3d 1050, 1057 (8th Cir.2004).

**17.** Plaintiff's Complaint does not allege that Defendant acted with scienter; it merely alleges failure to disclose. *See Kearney v. Prudential–Bache Secs., Inc.,* 701 F.Supp. 416, 430 (S.D.N.Y.1988) (finding that summary judgment was warranted on a plaintiff's CEA claim where the plaintiff had failed "to raise

misrepresentation of material [18] fact; 3) Plaintiff reasonably relied on the misrepresentation; and 4) the misrepresentation proximately caused Plaintiff's injury. *See Beck v. Jonasson,* CFTC No. 08–R027, Comm. Fut. L. Rep. P 31313, 2009 WL 290970, at *3 (C.F.T.C. Feb. 4, 2009).

■ Proximate causation generally requires evidence that a defendant's conduct was not only the "but for" cause of a plaintiff's damages, but was also a "substantial factor" in bringing about such damages. *See* Eighth Circuit Model Jury Instruction 8.35 (2011) ("[T]he term 'proximate cause' means a cause of damage or injury that played a substantial part in bringing about the injury or damage. The injury or damage must have been either a direct result of or a reasonable probable consequence of the cause and except for the cause the injury would not have occurred."). While Plaintiff has arguably demonstrated "but for" causation by alleging that it would not have contracted with Defendant had it known Defendant was not registered as a CTA, it has failed to demonstrate that Defendant's failure to register was a "substantial factor" in bringing about the Plaintiff's loss. That is, even assuming that Plaintiff would not have relied on Defendant to advise it in regard to commodity trading "but for" Defendant's failure to advise of its non-registered status, Plaintiff has presented no evidence that Defendant's lack of CTA registration made it reasonably probable that Plaintiff would sustain losses by relying on Defendant's advice. *See Steen v. Monex Int'l Ltd.,* No. 84–R339, Comm. Fut. L. Rep. P 25245, 1992 WL 41433, at *5 (C.F.T.C. Mar. 3, 1992) (finding probable cause where: "1) respondent's violative conduct was a substantial factor in bringing about complainant's loss and 2) the loss was a reasonably probable consequence of respondent's conduct").

The court's conclusion that the CEA requires some causation showing beyond "but for" causation is bolstered by the rulings of courts finding that § 4b of the CEA "incorporates the common law principle that one who misrepresents [or omits] a material fact is liable only for those losses flowing from actions reasonably induced ('caused') by the misrepresentation

even a hint of recklessness or careless disregard for plaintiff's interest"); *see also* Fed. R.Civ.P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). In fact, the Court cannot find any allegation anywhere in the record that Defendant knowingly or intentionally sought to "induce" Plaintiff into transacting business with it by not disclosing its registration status. This constitutes a separate basis upon which Plaintiff's CEA claim is inadequate as a matter of law.

**18.** Accepting that CTA registration is subject to a rebuttable presumption of materiality, *see Hall v. Paine Webber Jackson & Curtis, Inc., infra* note 21, Renaud's deposition testimony admitting that he does not know anything about the CEA (and presumably the significance of registration thereunder) undercuts the presumption to at least some extent:

Q.  Did you ask if [Defendant] was registered as a commodity trading advisor in that meeting?
A.  No.
Q.  Did you even know what the Commodity Exchange Act was at that time?
A.  I'm sure I didn't.
Q.  When did you first learn about a thing called the Commodity Exchange Act?
A.  I have no idea.
Q.  Do you even know what that is today?
A.  No.
Q.  Did the Commodity Exchange Act have any bearing on your decision to use [Defendant's services]?
    . . .
A.  I don't know what he's talking about.
Q.  You don't know what that act is?
A.  No. Maybe if you said it and then I could put it together. But, no, I cannot tell you what that act is.

Def.'s App. at 8–9 (Renaud Dep.).

or omission." *Clayton Brokerage Co. of St. Louis v. C.F.T.C.*, 794 F.2d 573, 578 (11th Cir.1986) (citing *Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061, 1068 (5th Cir. 1979)). Thus:

[A] plaintiff proceeding with a claim under section 4b must show "loss causation." Whereas a showing that the plaintiff's reliance induced him or her to enter into the transaction ("but for" allegations) satisfies the "transaction causation" requirement, loss causation, on the other hand, requires a direct or proximate relationship between the loss and the misrepresentation or omission and may not be supplied by but for allegations. *Wilson v. Ruffa & Hanover, P.C.*, 844 F.2d 81, 86 (2d Cir.1988).

*Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 490 (S.D.Fla.1996); *see also Kearney v. Prudential–Bache Secs. Inc.*, 701 F.Supp. 416, 426 (S.D.N.Y.1988) ("[I]n order for a misrepresentation to be actionable under the Securities Exchange Act and the Commodity Exchange Act, it must be fundamental to the nature of a particular securities or commodity trading device."); *Muniz v. Lassila*, No. 87–R395, Comm. Fut. L. Rep. P 25,225, 1992 WL 10629, at *6 (C.F.T.C. Jan. 17, 1992) ("It is self-evident that every customer loss does not result from injurious conduct.... It is also evident ... that not all violations of the Act cause harm to customers. Even when a statutory violation and customer losses are present in the same set of circumstances, a cause-and-effect relationship is not automatically assumed.").

The Court recognizes that in *Waters*, the district court stated, "in an action under the CEA, a plaintiff may satisfy the loss causation requirement that the loss be directly related to the misrepresentation or omission by showing that the decision to invest was induced [19] by the misrepresentation or omission and that the investment that was so induced resulted in the losses complained of." *Waters*, 172 F.R.D. at 490. This statement, at first glance, might appear to support Plaintiff's position that it has a viable claim because it allegedly would not have done business with Defendant had it known Defendant was not registered as a CTA. However, it does not appear that the *Waters* court intended the statement to be quite so sweeping in nature. The claim in *Waters* was that the defendants fraudulently induced the plaintiffs to invest by failing to disclose *material facts about the risks of commodities trading*, and indeed, the *Waters* court made its more generalized causation statement only after specifically finding that "the decision to invest in commodities at all may be precipitated by omissions *concerning the risks involved in trading commodities*" *Id.* (emphasis added).

Likewise, in *Garnatz v. Stifel, Nicolaus & Co., Inc.*, the Eighth Circuit permitted rescissory damages where the defendant induced a plaintiff to participate in a special bond margin account program by *misrepresenting the profit and loss risks* associated with investing in the program. 559 F.2d 1357, 1360–61 (8th Cir.1977) (emphasis added) (noting that the plaintiff specifically relied on defendant's statements that there was no risk to the plaintiff's capital, that the bonds purchased would not decrease more than 1% in value, that the interest rate would never exceed 8%, and that purchases recommended by the defendant would be without risk). The

---

**19.** Plaintiff's claim of "inducement" appears to rest solely on the allegation that Defendant failed to tell Plaintiff that it was not registered as a CTA. Renaud, however, affirmatively alleges in his affidavit that he "placed [his] trust and confidence in FRML because of the superior knowledge and experience in commodity options and futures trading claimed by FRML's employees." Pl.'s App. at 14 (Renaud Aff. ¶ 12).

Eighth Circuit noted that the "gravamen of the present action was not whether Garnatz bought the bonds for a fair price, but that he bought at all." *Id.* at 1360. That is, the evidence firmly supported a conclusion that, without the defendant's misrepresentations regarding the safety of the program, the plaintiff would not have invested. *Id.* at 1361. Responding to defendant's argument that a rescissory measure of damages "allows recovery of losses due to market forces rather than the defendant's conduct," the Eighth Circuit conceded that defendant's conduct did not cause the decline in value of the bonds, but stated, "plaintiff's purchase of these low-rated and non-rated bonds was induced by defendants' wrongful concealment of the risks normally attendant to such transactions. Those risks should therefore rightly be borne by defendants." *Id.* Importantly, however, the Court went on to state that "since plaintiff's losses were natural, proximate, and foreseeable consequences of defendants' fraud, the causative connection is sufficient." *Id.*

It is this "natural, proximate, and foreseeable" component of causation that is ultimately lacking from Plaintiff's bald "but for" causation assertion. In cases such as those discussed, where risks of commodities trading remain undisclosed or are misrepresented, it is easy to see how an unsuspecting investor could foreseeably sustain losses far beyond those reasonably expected absent the misrepresentations or omissions. Without diminishing the importance of registration under the CEA, however, the same cannot be said of a registration violation, i.e., the mere fact that an advisor is required to be registered, but is not, does not naturally, proximately, and foreseeably support a belief that an investor will be financially damaged by relying on the unregistered advisor's advice. To accept Plaintiff's arguments of causation in this case would transform the failure to register into a strict liability tort. That is, whenever an investor experiences losses in commodities trades, it can hold its advisor liable for any and all losses merely by discovering a registration violation and claiming that it would not have transacted business with the advisor had it known of the violation.[20] Such a result does not, in this Court's view, comport with traditional principles of proximate causation or fairness.[21]

The requirement of more than "but for" causation in the context of Plaintiff's fraud claim in this case is further supported by the statutory language that creates the CEA cause of action. In *Hudson v. Wilhelm*, the Court emphasized the fact that recovery under the CEA can only be had pursuant to 7 U.S.C. § 25, which provides that a person who violates the CEA shall be liable "for actual damages ... *caused by such violation.*" 651 F.Supp. 1062,

---

**20.** The Court finds it worthy of note, in regard to the causation analysis, that Plaintiff has never stated it would not have engaged in trading commodities at all were it aware of Defendant's non-registered status, merely that it would not have "done business with Defendant[]." Compl. ¶ 23; Pl.'s App. at 15 (Renaud Aff. ¶ 15). This emphasizes the "strict liability" nature of Plaintiff's asserted CEA claim, i.e., if Defendant had been registered and rendered precisely the same trading advice, with precisely the same outcome to Plaintiff's bottom line, Defendant would not be subject to liability for Plaintiff's claimed losses. However, merely due to the lack of registration, Defendant is arguably "on the hook" for whatever loss Plaintiff claims, even though the mere fact of registration cannot assure the propriety or reliability of an advisor's trading advice.

**21.** At least one court has found that the "mere failure to register does not amount to fraud, deceit or misrepresentation sufficient to justify rescission." *Hofmayer v. Dean Witter & Co. Inc.*, 459 F.Supp. 733, 739 (N.D.Cal.1978).

1067 (D.Colo.1987) (emphasis added). The *Hudson* court determined that the "caused by such violation" language of 7 U.S.C. § 25 "clearly indicates the violation must cause the actual damages alleged." *Id.* at 1067. Accordingly, the court rejected causation in circumstances similar to those here:

> Plaintiff contends causation is "clearly present, since plaintiff would have never permitted the defendants to illegally trade on her account if she had known that the defendants were not properly registered in commodities futures." Plaintiff seems to be arguing a "but for" type of causation in this sentence. Had she known of the registration deficiencies, she would not have allowed defendants to trade on her account. This argument, however, tacitly concedes plaintiff's monetary losses are not themselves the direct result of defendants' registration improprieties. Instead, plaintiff argues she never would have incurred the losses in the first place because, had she known of the registration problem, she would not have permitted defendants to handle her money at all. The legal import of this argument is to transform the eighth claim for relief into a claim for misrepresentation. Plaintiff is not alleging her monetary losses were caused by defendants' failure to register properly. Rather, she is

contending her pecuniary damages were occasioned by defendants' concealment of possible registration problems.

*Id.* at 1068; *see also Biedron v. Futures,* No. 87C8425, 1989 WL 134796, at *4 (N.D.Ill.1989) ("Biedron does not say how the fact that Dorsey was not registered served to cause him, Biedron, to suffer financial loss. Even if Biedron intended ... to say that had he known that Dorsey was not registered he would never have consented to having his account traded by him, it still would not suffice to state a claim under the CEA. That line of argument suggests that Dorsey's failure to be registered serves as a *but for* cause of Biedron's losses, not a proximate cause.").

Since Plaintiff may only recover actual damages *caused by* the Defendant's failure to register, there must be some evidence beyond "but for" causation linking Plaintiff's damages to the Defendant's registration requirements. No such evidence exists in this case. Indeed, Renaud has testified that, to this day, he does not even know what the CEA is. *See* Def.'s App. at 8–9. Likewise, Plaintiff's expert, Nicolas Zagotta ("Zagotta"), has testified that he did not consider the lack of registration in any way in his analysis of the case.[22] *See* Def.'s Facts ¶ 38; Pl.'s Resp. to Def.'s Facts ¶ 38.

---

**22.** Plaintiff cites several cases in support of the proposition that a fraudulent inducement claim is viable where a plaintiff alleges that it would not have done business with the defendant at all had it known of the violation of the registration requirement. *See* Pl.'s Br. at 7–9 (citing *Hall v. Paine Webber Jackson & Curtis, Inc.,* No. 80–736–80–539, 1986 WL 65916 (C.F.T.C. Oct. 6, 1986) (finding that nonregistration is a material fact and that there is a rebuttable presumption of reliance where the petitioner alleged he would not have done business with an unregistered broker) and *Maloley v. R.J. O'Brien & Associates, Inc.,* No. R81–752–82–112, 1988 WL 228801 (C.F.T.C. July 22, 1988) (finding that respondent's as-

sertion that a petitioner could not recover absent proof that specific losses were proximately caused by the lack of registration "misconstrues the nature of the claim at issue")). The Court does not find these cases compelling. First, these cases were decided in reparations proceedings before the CFTC under 7 U.S.C. § 18 and are not binding precedent. Second, neither of these cases—nor any other case the Court can locate—discuss the proximate causation component of the analysis in any significant way. Indeed, case law on this issue is sparse, to say the least, and the Court cannot locate a single case in the CFTC reporter that discusses a

### B. Plaintiff's Breach of Fiduciary Duty Claim

Plaintiff's Complaint makes the following specific allegations in relation to the breach of fiduciary duty claim:

27. S & A repleads paragraphs 1–15 as if fully set out herein.

28. Defendants offered S & A commodities trading advice. In marketing themselves, Defendants represented to S & A that they had education, training and experience above that of S & A.

29. Defendants represented to S & A that their superior abilities enabled them to provide essential price and risk management advice.

30. Defendants created a relationship of trust and confidence in their abilities based on their represented experience, education, and training.

31. S & A relied upon the alleged superior price and risk management ability of Defendants.

32. S & A did not have nearly the same education, training or experience as Defendants represented they had.

33. Defendants dominated the relationship with regard to price and risk management advice.

34. Defendants breached their fiduciary duty.

35. Defendants breach of its fiduciary duty was a proximate cause of damage to S & A.

36. S & A was financially injured in an amount greatly exceeding the jurisdictional amount.

Compl. at 4–5.

To sustain its claim for breach of fiduciary duty, Plaintiff bears the burden of proving: 1) the existence of a fiduciary relationship; 2) Defendant breached a fiduciary duty to Plaintiff; 3) Defendant's breach of its fiduciary duty to Plaintiff was a proximate cause of damage to the Plaintiff; and 4) the amount of damage. *See* Iowa Jury Ins. 3200.1. Defendant contends that Plaintiff has failed to sustain its burden in a variety of ways. Specifically, Defendant points out that Plaintiff "had not stated or established what exactly Defendants' alleged fiduciary duty was, nor has Plaintiff put forth evidence as to how such duty was allegedly breached by Defendants." Def.'s Br. at 12. Moreover, Defendant contends that Plaintiff has failed to put forth evidence that would establish that Defendant's actions proximately caused any damage to Plaintiff. *Id.* at 13.

### 1. Standard of care and breach.

The Court agrees with Defendant that Plaintiff's breach of fiduciary claim

plaintiff or petitioner's evidentiary burden to link its claimed damages to that conduct by a defendant or respondent that is alleged to violate the CEA. Moreover, in most CFTC cases, the registration violation is accompanied by other violations of the CEA, but the opinions contain no explanation as to how each violation leads, if at all, to a reparation award (cease and desist orders and civil monetary penalties are also common remedies in CFTC cases). *E.g., Hall,* 1986 WL 65916, at *4 (finding respondent violated the CEA by failing to register, by assuring petitioner that limited funds would be at risk at any one time, and by misrepresenting who had devel-

oped the trading strategy employed). Finally, some CFTC cases have rejected the notion that a failure to register proximately causes trade losses. *E.g., Int'l Cattle Sys. v. Parsons,* No. 76–392, Comm. Fut. L. Rep. P 21,367, 1982 U.S. Dist. LEXIS 18351, at *7 (D.Kan. Mar. 9, 1982) (rejecting failure to register as basis for damages and finding that "what is missing here is the necessary link of causation and reliance between the failure to register and the Parsons' trading losses. It is impossible for this Court to understand how it would have made any difference had the ICS employees been registered at the time of the losing trades." (internal citation omitted)).

cannot survive. Even assuming that Defendant owed fiduciary duties to Plaintiff,[23] there is no evidence in the record as to what alleged standard of care Defendant allegedly owed, or as to how Defendant breached that standard of care. Regarding the breach of duty element, Plaintiff argues merely that Defendant "breached its fiduciary duty to S & A by recommending a trading strategy for S & A's account that was speculative in nature and not a legitimate hedging strategy, when it knew that S & A was seeking advice for risk management purposes." Pl.'s Br. at 17. Plaintiff's claim that Defendant breached its fiduciary duty, thereby proximately causing Plaintiff's damages, comes exclusively from the concluding sentence of the report of its expert witness, Zagotta, which provides: "I believe from the materials I was provided that the trading strategy (if there was one) was speculative in nature as opposed to a legitimate hedge and it was the speculative overtraded nature of the position that led to the million dollar loss." Def.'s App. at 85.

To determine whether Defendant breached its fiduciary duty to Plaintiff, a jury will be required to determine the scope and extent of the duty owed. The jury will be further obligated to determine whether Defendant's conduct was deficient with regard to the applicable standard of care. The Iowa Supreme Court has stated:

Persons engaged in the practice of a profession or trade are held to the standard of " 'the skill and knowledge nor-mally possessed by members of that profession or trade in good standing in similar communities.' " *Kastler v. Iowa Methodist Hosp.*, 193 N.W.2d 98, 101 (Iowa 1971) (quoting Restatement (Second) of Torts § 283 (1965)). The burden rested upon [the plaintiff] to prove [the professional's] breach of this standard of care. *See Devine v. Wilson*, 373 N.W.2d 155, 157 (Iowa App.1985). Unless a professional's lack of care is so obvious as to be within the comprehension of a layperson, the standard of care and its breach must ordinarily be established through expert testimony. *Perin v. Hayne*, 210 N.W.2d 609, 613 (Iowa 1973); *Devine*, 373 N.W.2d at 157.

*Humiston Grain Co. v. Rowley Interstate Transp. Co., Inc.*, 512 N.W.2d 573, 575 (Iowa 1994). In this case, expert testimony regarding the "standard of care and its breach" is necessary because the duty of care governing commodities and futures trading advisors are not "so obvious as to be within the comprehension of a layperson." *Id.*

While Zagotta's report does recount, generally, the requirements for "a derivative hedge of a cash position to be a *legitimate* hedge," Def.'s App. at 63, it neither establishes the standard of care that was applicable to Defendant's trading advice, nor recounts how Defendant's trading advice constituted a breach of that standard of care. Indeed, Plaintiff freely admits that Zagotta does not even know *what* advice Defendant provided to Plaintiff, let alone the reasons therefor.[24] Def.'s Facts

---

23. Regarding its claim for breach of fiduciary duty, Plaintiff's resistance brief uses six out of seven paragraphs to explain why there is a genuine issue of material fact on the existence of a duty. The Court sees no need to address Plaintiff's argument in this regard because it is assuming, for purposes of its analysis, that Defendant owed Plaintiff a fiduciary duty of some sort.

24. Zagotta testified at deposition that he did not know who came up with the trading strategy employed by Plaintiff, did not compare any net loss by Plaintiff to any gain on S & A's cash side, has no knowledge whether other possible strategies were discussed between Plaintiff and Defendant, does not know if Plaintiff incurred any margin calls with MF Global, does not know why Plaintiff was trad-

¶¶ 32–33; Def.'s App. at 47 (Zagotta testifying at deposition that he "[does not] know the advice, if any, that was given between [Defendant] and [Plaintiff] on" the dates of any trades); *see also* Fed. R.Evid. 703 (requiring expert opinion to be based on the "facts or date in the particular case"). Indeed, even assuming that Zagotta is correct that Defendant's trade strategy was "speculative" and "overtraded," this does not equal an opinion that Defendant's actions were in breach of any particular duty of care owed to Plaintiff.

### 2. *Proximate causation.*

■ While "questions of … proximate cause are ordinarily for the jury to decide," "they may be decided as matters of law in exceptional cases." *Scoggins v. Wal–Mart Stores, Inc.*, 560 N.W.2d 564, 566–67 (Iowa 1997) (citations omitted). Under Iowa law, causation has two components: 1) " 'the defendant's conduct must have *in fact caused* the plaintiff's damages (generally a factual inquiry)' " and 2) " 'the policy of the law must require the defendant to be *legally responsible* for the injury (generally a legal question).' "[25] *Scoggins*, 560 N.W.2d at 567 (quoting *Gerst v. Marshall*, 549 N.W.2d 810, 815 (Iowa 1996)). In conducting the factual inquiry, a court must look to two components: 1) "whether the harm would not have occurred *but for* the negligence of the defen-

dant, and 2) whether the negligence of the defendant was a substantial factor in bringing about the harm." *Id.* (citing *Gerst*, 549 N.W.2d at 817).

■ In this case, Plaintiff's claim of breach of fiduciary duty also fails because the record is devoid of evidence that Plaintiff's monetary losses were proximately caused by any action or advice of the Defendant. In fact, it appears that Plaintiff's proximate causation argument is premised solely on the fact that Defendant rendered advice to Plaintiff, and Plaintiff ultimately lost money by following that advice. *See* Pl.'s Br. at 17 ("S & A is entitled to recovery of its out-of-pocket losses, since all but one of the trades entered for its account was based upon the inappropriate trading strategy developed by [Defendant]."). While this *may* be sufficient to establish the "but for" component of factual causation—i.e., Plaintiff would not have made the trades, thereby sustaining losses, "but for" Defendant's advice—it is wholly insufficient to satisfy the "substantial factor" component of factual causation.

■ In evaluating whether a defendant's conduct is a "substantial factor" in bringing about the harm sustained, courts must look to the " 'proximity and foreseeability of the harm flowing from the actor's

---

ing soybeans as part of its hog operation, does not know if the MF Global account was used exclusively for the Plaintiff's hog operation or not, and does not know why cotton, cattle, and soybean trades were made. Def.'s App. at 43, 46, 49, 50–52.

25. In conducting the legal inquiry, the court must determine if " 'the policy of the law will extend responsibility to those consequences which have in fact been produced by an actor's conduct.' " *Scoggins*, 560 N.W.2d at 567 (quoting *Kelly*, 476 N.W.2d at 349). Ordinarily, this question can be answered affirmatively where it can be shown that there is "no

other rule of law relieving the actor of liability because of the manner in which his negligence resulted in the harm," *id.* (quoting *Kelly v. Sinclair Oil Corp.*, 476 N.W.2d 341, 349 (Iowa 1991)), and where the harm "resulted from the risks that made the actor's conduct tortious." *Thompson v. Kaczinski*, 774 N.W.2d 829, 837 (Iowa 2009). The legal inquiry, also known as the "scope of liability" inquiry, is "fact-intensive as it requires consideration of the risks that made the actor's conduct tortious and a determination of whether the harm at issue is a result of any of those risks." *Id.*

conduct, although it is not necessary that the actual consequences of a defendant's negligence should have been foreseen.'" *Scoggins,* 560 N.W.2d at 567 (quoting *Kelly v. Sinclair Oil Corp.,* 476 N.W.2d 341, 349 (Iowa 1991)). Thus, there must be some evidence from which a reasonable jury could conclude that Defendant should have foreseen that its trading strategy would have resulted in damage or harm to Plaintiff. *See Scoggins,* 560 N.W.2d at 567. Here, however, Renaud has testified that he relied entirely on Zagotta to determine Plaintiff's damages and that he doesn't "know exactly" what Plaintiff's damages even are. Def.'s App. at 18–19. More significantly, Zagotta "has not rendered an opinion, and will not testify at trial, as to whether the loss suffered by [Plaintiff] in its commodities trading account was caused by [Defendant]." Def.'s Facts ¶ 30; Pl.'s Resp. to Def.'s Facts ¶ 30 ("Admitted."); *see* Def.'s App. at 57 (Q: "And so you're not claiming that [Defendant] caused all of those losses that you have called a net loss to [the MF Global] account. Is that fair?" ... Zagotta: "Yeah, I don't think I'm going to be called on to give an opinion on that.").[26] In

short, Plaintiff has not identified *any* evidence, beyond the fact that Plaintiff lost money, causally linking Defendant's actions to its claimed damages. *See Kolbeck v. LIT Am., Inc.* 939 F.Supp. 240, 249 (S.D.N.Y.1996) (denying a plaintiff's motion to amend its breach of fiduciary duty claim to allege that the defendant failed to register under the CEA: "Schindler's failure to register, and defendants' failure to investigate that lapse, had little if anything to do with plaintiffs' losses. Plaintiffs' theory of causation appears to be that if defendants had investigated Schindler's status and learned that he was not registered, defendants would have ceased doing business with Schindler, or would have required him to register with the CFTC. It follows, plaintiffs urge, that either course of conduct would have prevented plaintiffs' losses. That chain of causation, however, is far too long to constitute proximate cause.").[27]

## C. *Plaintiff's Negligence Claim*

■ Plaintiff's Complaint makes the following specific allegations in relation to the negligence claim:

**26.** Zagotta's report evidences his belief that the mere fact that Plaintiff lost money demonstrates that Defendant's strategy was bad. *See* Def.'s App. at 65 ("The hedge strategy employed by the defendants was neither simple nor effective. This is evidenced by the $1,040,958.75 loss sustained by S & A during the course of its involvement with Defendant."). Moreover, though Zagotta proposes some alternative strategies that Plaintiff could have employed to manage its risk, he did no calculations to demonstrate that such strategy would have spared Plaintiff any losses, or to what extent.

**27.** Defendant also points out that, during discovery, it served a contention interrogatory on Plaintiff requesting that Plaintiff "identify and provide all facts and documents that support each and every one of the contentions made in Paragraphs 27 through 36 of the Complaint as part of the claim asserted in

Count II therein for Breach of Fiduciary Duty." Def.'s Br. at 11–12. Plaintiff's response was that the "relevant facts are set for the in the Complaint." *Id.* at 12. Plaintiff's response additionally identifies relevant documents as NFA registration records, MF Global account statements, Q-sheets prepared by Defendant, Plaintiff's payment checks, and Plaintiff's notes, and representations made on Defendant's website. Def.'s App. at 98. None of these cited documents establishes the duty, breach, or proximate cause elements of Plaintiff's claim. Indeed, as Defendant points out, "Plaintiff's Breach of Fiduciary Duty cause of action was never discussed in any of the depositions taken in relation to this lawsuit," and it appears that Plaintiff is "relying on the conclusory assertions contained it the Complaint" to support its claim. *See* Def.'s Br. at 12.

37. S & A repleads paragraphs 1–15 as if fully set out herein.

38. Defendants owed S & A a duty of care commensurate with their representations, agreement, and industry standards.

39. Defendants breached their duties in the following particulars;

   A. Failure to disclose their non-registration under the Commodity Exchange Act.

   B. Failure to disclose all material information concerning their experience, education and training concerning price & risk management advice.

   C. Failure to provide advice concerning price and risk management within industry standards.

   D. Failure to provide advice within the investment goals and risk tolerance of S & A.

   E. Failure to advise of a proper price and risk management strategy to achieve S & A goals.

   F. Failure to monitor recommended trades.

   G. Failure to advise S & A of risks associated with recommended strategies.

40. Defendants' breach of their duty was a proximate cause of financial damage to S & A.

41. S & A was financially damaged as a result of Defendants' negligent advice in an amount greatly exceeding the jurisdictional amount.

Compl. at 5–6.

▮▮▮▮ "Negligence is generally defined as conduct that falls below the standard established by law for the protection of others against unreasonable risk of harm." *Knake v. King*, 492 N.W.2d 416, 417 (Iowa 1992). Under Iowa law, the elements for a cause of action for negligence are: 1) the existence of a duty to conform to a standard of conduct for the protection of others; 2) the failure to conform to that standard; 3) proximate causation; and 4) damages. *Hartig v. Francois*, 562 N.W.2d 427, 429 (Iowa 1997) (citing *Marcus v. Young*, 538 N.W.2d 285, 288 (Iowa 1995), and W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 30 (5th ed.1984)).

1. *Standard of care and breach.*

Plaintiff's negligence claim against Defendant fails for the essentially the same reasons stated *supra* with regard to Plaintiffs' breach of fiduciary duty claim. That is, Plaintiff has failed to demonstrate *what* standard of care was owed, and also has failed to put forth sufficient evidence demonstrating how Defendant failed to conform to that standard.[28]

2. *Proximate causation.*

▮▮▮ Plaintiff's negligence claim likewise fails for lack of proximate causation. Neither Plaintiff nor its expert has proffered any evidence that anything Defendant did or did not do caused damage to Plaintiff.[29]

---

**28.** To the extent that Plaintiff's negligence claim asserts wrongdoing by Defendant beyond failing to disclose its nonregistered status, i.e., that Defendant failed to provide advice within Plaintiff's tolerance, failed to monitor recommended trades, and failed to disclose experience and educations, the Court can find absolutely no evidence in the record supporting such allegations.

**29.** Defendant argues that Plaintiff's state law claims are barred by the economic loss doctrine. The economic loss doctrine generally prohibits tort recovery for purely economic losses, relegating such claims to contract law. *See Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 122 (Iowa 1988) ("A plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner

### D. Misrepresentation.[30]

■ To sustain its claim for misrepresentation, Plaintiff must demonstrate: 1) special circumstances existed which gave rise to a duty of disclosure between Plaintiff and the Defendant; 2) while such relationship existed, Defendant was aware that it had failed to register as a CTA, had limited experience in appropriate commodities trading strategies, or that there were risks associated with its recommended trading strategies;[31] 3) while such relationship existed, Defendant concealed or failed to disclose such matters; 4) the un-

---

which is legally cognizable or compensable."); *Richards v. Midland Brick Sales Co.*, 551 N.W.2d 649, 650 (Iowa Ct.App.1996) (stating that the economic loss doctrine is a "generally recognized principle of law that plaintiffs cannot recover in tort when they have suffered only economic harm").

With regard to Plaintiff's fraudulent nondisclosure and breach of fiduciary duty claims, the doctrine is likely inapplicable under Iowa law. *See, e.g., Cunningham v. PFL Life Ins. Co.*, 42 F.Supp.2d 872, 887 (N.D.Iowa 1999) ("Although Iowa courts have not plainly stated that fraud claims are an exception to the economic loss doctrine, the case law does suggest that if confronted with the question directly, Iowa would articulate that position."); *Union County, Iowa v. Piper Jaffray & Co., Inc.* 741 F.Supp.2d 1064, 1114 (S.D.Iowa 2010) ("While the applicability of the doctrine in Iowa is less clear with respect to a breach of fiduciary duty claim, the Court can find no Iowa case applying the doctrine to an intentional tort, such as breach of fiduciary duty.") (citing *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 682 (Iowa 2004) (noting that a claim of breach of fiduciary duty is an intentional tort); *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 138 (1996) (same); *Poulsen v. Russell*, 300 N.W.2d 289 (Iowa 1981) (affirming actual damages award, which includes economic loss component, on breach of fiduciary duty claim)).

With regard to Plaintiff's negligence claim, seeking purely economic damages alleged sustained as a result of its contractual relationship with Defendant, the economic loss doctrine would appear to bar the claim. *See Audio Odyssey, Ltd. v. United States*, 373 F.3d 870, 872 (8th Cir.2004) ("Iowa has adopted the economic-loss doctrine with respect to cases of alleged negligence. The doctrine simply states that 'purely economic or business losses' are not recoverable under negligence theories. The Iowa Supreme Court has defined a 'purely economic loss' as a loss not related to physical harm.") (quoting *Neb. Innkeepers, Inc. v. Pittsburgh–Des Moines Corp.*,

345 N.W.2d 124, 126 (Iowa 1984) and *Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 123–25 (Iowa 1988)). Despite the allegations in Plaintiff's Complaint, which track the elements for an ordinary negligence claim, Plaintiff attempts in its resistance brief to recast the claim as one for professional malpractice. *See* Pl.'s Br. at 11 ("The claim here might be summed up as unregistered CTA malpractice, and as such falls outside the scope of the economic loss doctrine."). This argument is unavailing, for the reasons discussed *supra*, *i.e.*, Plaintiff has not provided any testimony—expert or otherwise—demonstrating *what* standard of care was allegedly owed, how such standard of care was breached, or that any action by Defendant proximately caused Plaintiff's damages. *See* Def.'s Reply ("Plaintiff's expert ... simply stated that he disagreed with the investment strategy utilized, not that Defendant's breached any certain standard of care. In fact, Mr. Zagotta's expert witness report is void of reference to any such standard of care [and is] void of any reference to Defendants' failure to register with the CFTC as a CTA."); *see also* Pl.'s Resp. to Def.'s Facts ¶ 30 (admitting that Zagotta "has not rendered an opinion, and will not testify at trial, as to whether the loss suffered by [Plaintiff] in its commodities trading account was caused by [Defendant])."

30. Though Plaintiff's Complaint does not specify whether it is asserting a negligent misrepresentation claim or a fraudulent misrepresentation claim, it appears from Plaintiff's brief that Plaintiff's claim is for fraudulent misrepresentation—specifically, fraudulent nondisclosure. *See* Pl.'s Br. at 17–18 (reciting the elements of a fraudulent nondisclosure claim).

31. Again, the Court notes that the record contains no evidence that Defendant failed to reveal its limited experience in appropriate commodities trading strategies or that Defendant failed to disclose risks associated with recommended trading strategies.

disclosed information was material to the transaction; 5) Defendant knowingly failed to make the disclosure; 6) Defendant intended to deceive the plaintiff by withholding such information; 7) Plaintiff acted in reliance upon the defendant's failure to disclose and was justified in such reliance; 8) the failure to disclose was a cause of Plaintiff's damage; and 9) the nature and extent of damage. *See Sinnard v. Roach,* 414 N.W.2d 100, 105–06 (Iowa 1987); Iowa Civ. Jury Ins. 810.2.

Assuming that Plaintiff has adequately supported the first four elements of its nondisclosure claim, Defendants correctly point out that Plaintiff has proffered no evidence that Defendant knowingly failed to disclose such information to Plaintiff or that Defendant intended to deceive Plaintiff by withholding the information. Indeed, Plaintiff does not even attempt to address the deficiencies of its claim in regard to these two elements. *See* Pl.'s Br. at 17–19. More significantly, however, Plaintiff's fraudulent nondisclosure claim

fails because Plaintiff has not provided any evidence that Defendant's failure to disclose relevant information was a "substantial factor" in causing Plaintiff's harm. As discussed extensively *supra,* the mere allegation of "but for" causation is insufficient to prove proximate causation.[32] This is particularly true where, as here, there is no proposed testimony tending to support a conclusion that any action by the Defendant contributed to or caused Plaintiff's damage.[33]

## IV. CONCLUSION

The Court does not take away a party's right to a jury trial lightly, and it is extremely cognizant of the harsh result its ruling imposes on Plaintiff in this matter. Nonetheless, after carefully reviewing the record in the light most favorable to Plaintiff, the Court is convinced that Plaintiff has failed to generate a genuine issue of material fact on several essential elements of its claims. Indeed, an equally harsh

**32.** Defendant argues, and the Court agrees, that Plaintiff's fraudulent nondisclosure claim is premised almost exclusively on the allegations of the Complaint. *See supra* note 23; Def.'s Br. at 15 (noting that Plaintiff's response to Defendant's contention interrogatory regarding the fraudulent nondisclosure claim contains precisely the same response as Plaintiff's response to the contention interrogatory regarding its breach of fiduciary duty claim, and further pointing out that the "[m]isrepresentation cause of action was never discussed in any of the depositions taken in relation to this lawsuit").

**33.** Defendants allege that Plaintiff's damages, generally, are also insufficient to sustain its claim. Though this issue is inextricably intertwined with the proximate causation analysis, the Court nonetheless agrees with Defendant that the mere fact that Plaintiff had a decrease in account value does not mean that Plaintiff sustained "actual damages." *See* Def.'s Br. at 17 ("There is no dispute that there was less money in S & A's account at the end of the applicable time period. How-

ever, that does not equate to a recoverable damage."). The Court further agrees with Defendant that Zagotta's calculation of damages is insufficient to permit a jury to reasonably infer or approximate damages. *See id.* at 18–19 ("Here, the only evidence of any alleged damage is the alleged 'net loss' incurred from September 20, 2007 to February 24, 2009. As stated, this figure does not account for a number of items that even Mr. Zagotta admits must be considered [such as whether Plaintiff would have saved money (and if so, how much) by employing an alternate trading strategy and the fact that Zagotta did not account for gains on Plaintiff's "cash side" in his calculations], and it includes other items that should not be included [such as the effect of trades Plaintiff made without Defendant's advice on its losses]. In short, the 'net loss' calculation does not provide a reasonable basis to approximate any damages that may have been incurred due to a specific action of the Defendants. Instead, it is simply a figure that shows the decrease in S & A's account over time.").

result would be imposed on the Defendant were the case permitted to proceed to trial when evidence of matters so fundamental as scienter, duty, breach, and proximate causation are insufficiently supported by the record. Accordingly, for the reasons stated herein, Defendant's Motion for Summary Judgment (Clerk's No. 39) is GRANTED. The Clerk of Court shall enter judgment in favor of Defendant on all claims.

IT IS SO ORDERED.