**Milton W. GARNATZ, Appellee,**

v.

**STIFEL, NICOLAUS & CO., INC., and Kingsley O. Wright, Appellants.***

No. 77–1048.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 15, 1977.

Decided Nov. 1, 1977.

---

* *Editor's Note:* The opinion of the U. S. Court of Appeals, Fifth Circuit, in *Mobile Mechanical Contractors Association, Inc. v. Carlough,* published in the advance sheets at this citation (559 F.2d 1357), was withdrawn from the bound volume at request of the court.

John R. Musgrave, St. Louis, Mo. (argued), Michael W. Forster of Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., on briefs, for appellants.

Samuel J. Goldenhersh, St. Louis, Mo. (argued), Mark I. Bronson, St. Louis, Mo., on brief, for appellee.

Before VAN OOSTERHOUT and MATTHES, Senior Circuit Judges, and STEPHENSON, Circuit Judge.

MATTHES, Senior Circuit Judge.

Stifel, Nicolaus & Co., a brokerage firm, and Kingsley O. Wright, a vice-president of that firm, appeal from a judgment entered against them on a jury verdict awarding Milton W. Garnatz damages of $45,000 with interest and costs. Count I of plaintiff's complaint was based on defendants' alleged violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; and § 17 of the Securities Act of 1933, 15 U.S.C. § 77q. Count II of the complaint was a pendent state claim for common law fraud.

Defendants press various contentions regarding the measure of damages, the sufficiency of the evidence, and the statute of limitations. We hold that the damages in this case were correctly measured and were supported by the evidence, and that plaintiff's action was timely.

## I

Garnatz is a man of limited education and modest means. His familiarity with the securities markets is characteristically that of the average, individual investor, not the sophisticated trader.

In November of 1972, plaintiff attended a series of investment seminars sponsored by Stifel, Nicolaus. On the basis of representations made at those seminars and at two personal meetings with Kingsley Wright, plaintiff agreed to participate in a special bond margin account program which was purportedly designed to maximize his income while preserving his capital. The representations plaintiff specifically relied on in deciding to join in the program were: (1) that all purchases had to be approved by the board of directors of Stifel, Nicolaus; (2) that the use of a margin account entailed no risk to plaintiff's capital; (3) that the bonds purchased would not decrease more than one percent in value; (4) that the interest rate on the margin account would never exceed eight percent; and (5) that defendants' recommended purchases would be without risk. Defendants do not seriously challenge the allegation that these representations were both false and material.

Plaintiff insisted on avoiding speculation, yet most of the bonds purchased for him were either low-rated or non-rated by Standard & Poors. Although safety was a key feature of defendants' sales pitch, in order to pay the interest rate on the margin account and still provide a sufficiently attractive return, it was apparently necessary to purchase high-yield, and consequently highly-speculative bonds. At no time was any bond purchase approved by the board of directors of Stifel, Nicolaus.

Plaintiff entered into the program in late 1972. By April of 1973, the market value of Garnatz' account had declined over one percent. As a result, plaintiff was forced to relinquish all income from the bonds to pay increased margin calls. During this period, Wright repeatedly reassured Garnatz that the drop was only temporary and strongly

recommended that plaintiff stay with the program, which he did. In August of 1974, the interest rate on the margin account jumped from eight percent to thirteen percent, as permitted by a change in Missouri's usury law. Garnatz does not dispute the fact that by that time he was, or should have been, on notice of the fraud.

## II

■ The implication of a private damage remedy for violations of the federal securities laws is based partly on the notion that the abrogation of a statutorily imposed duty is tortious. 1 A. Bromberg, Securities Law: Fraud § 2.4 (1977). Following the model of the common law tort of deceit, in § 10(b) and Rule 10b–5 actions "the defendant is liable to respond in such damages as naturally and proximately result from the fraud . . . ." *Estate Counselling Service v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 303 F.2d 527, 533 (10th Cir. 1962). Normally, federal courts measure those damages according to the out-of-pocket rule. *Harris v. American Investment Co.,* 523 F.2d 220, 224–26 (8th Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). As applied to a fraudulently induced purchase of securities, that rule provides for the recovery of the difference between the actual value of the securities and their purchase price. *Id.* at 225. Recovery is also allowed for any consequential damages proximately resulting from the fraud. D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES 601–06, 615 (1973); *see Estate Counselling Service v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra.* The rule was designed to provide plaintiffs with a compensatory recovery rather than allowing damages for a lost expectancy. D. DOBBS, *supra* at 595; *see Harris, supra* at 225. It works best in the typical situation where the defendant's fraud conceals the actual value of the item purchased, yet does not affect the overall market value of that item. *See id.* at 225–26.

Of course, the out-of-pocket rule is not a talisman. Indeed, this court has shown no hesitation in varying that measure when necessary on the facts of a given case. *See, e. g., Myzel v. Fields,* 386 F.2d 718, 745 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) (difficulty in ascertaining actual value). Our function is to fashion the remedy best suited to the harm.

■ In the present case, defendants urge strict application of the out-of-pocket rule. They would deny plaintiff any recovery at all, since the value of the bonds equalled their purchase price. But the fact that plaintiff got what he paid for does not mean he did not suffer any legally cognizable injury from defendants' fraud. It merely indicates that the fraud did not relate to the price of the bonds.

A similar problem was presented in *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir. 1970). In that case, the defendant's failure to reveal its market-making status with respect to the securities it recommended to the plaintiff for purchase was held to be a material omission in violation of Rule 10b–5. Under a traditional application of the out-of-pocket rule, the plaintiff would have recovered nothing, since the price paid was equal to the fair market value of the stocks. However, the court recognized that

> the evil is not the price at which [plaintiff] bought but the fact of being induced to buy and invest for some future growth in these stocks without disclosure . . . .

*Id.* at 1173. Since the plaintiff had sold his stock prior to discovering the fraud, the court allowed recovery of the difference between his purchase price and his resale price.

As in *Chasins,* the gravamen of the present action was not whether Garnatz bought the bonds for a fair price, but that he bought at all. Absent defendants' representations regarding the safety of the program, plaintiff's express disdain for speculation undoubtedly would have precluded his participation; but the fraudulent promise of a low-cost, income-maximizing, and risk-free investment package overcame

plaintiff's caution. Under these circumstances, we believe that a rescissory damage measure, similar to that employed by the court in *Chasins*, is appropriate. *See* Cobine, *Elements of Liability and Actual Damages in Rule 10b–5 Actions,* 1972 Ill. L.F. 651, 672–73; Comment, *The Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities,* 26 Stan.L.Rev. 371, 374–77 (1974). Such a measure seeks to return the parties to the status quo ante the sale. In effect, the plaintiff is refunded his purchase price, reduced by any value received as a result of the fraudulent transaction. As applied to the case at bar, plaintiff can recover the decline in value of his bonds until his actual or constructive notice of the fraud, as well as any other losses properly attributable to defendants' wrongdoing.[1] That decline in value is determined by the losses taken on bond sales plus the losses sustained on bonds held,[2] as long as all such losses were incurred prior to the date that plaintiff knew, or should have known, of the fraud.

■ Some would argue, as defendants have here, that a rescissory measure of damages allows recovery of losses due to market forces rather than the defendants' conduct. *See Green v. Occidental Petroleum Corp., supra* n. 1, at 1342. We recognize that neither Stifel, Nicolaus nor Kingsley

Wright caused plaintiff's bonds to decline in value. But plaintiff's purchase of these low-rated and non-rated bonds was induced by defendants' wrongful concealment of the risks normally attendant to such transactions. Those risks should therefore rightly be borne by defendants. Moreover, since plaintiff's losses were natural, proximate, and foreseeable consequences of defendants' fraud, the causative connection is sufficient. Of course, the responsibility for losses incurred after actual or constructive notice of the fraud must fall to plaintiff.

## III

We turn now to the evidence supporting the jury's verdict, drawing all reasonable inferences in plaintiff's favor.

### A. Actual or Constructive Notice of the Fraud

■ Wright admitted that Garnatz suffered losses of $22,600 on the sale of three of his bonds in December of 1973. He further admitted, and documentary evidence established, that by August, 1974, the market value of Garnatz' other bonds had dropped nearly $17,000. Commissions[3] on the various transactions involved were over $6,000. Thus, plaintiff's losses as of August, 1974, totalled just over $45,000. As that is also the figure awarded by the jury,

1. Several theoretical bases support the result we reach in this case. *See, e. g.,* D. Dobbs, *supra* at 614–18 (recovery of decline in market value as consequential damage award); F. Harper & F. James, The Law of Torts, 598–603 (1956) (out-of-pocket rule, but actual value determined in light of subsequent events or as of post-transaction date); *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335 (9th Cir. 1976) (Sneed, J., concurring in part) (rescissory damages).

We decline to adopt any one perspective. Given the atypical nature of this litigation ". . . it would be unwise to set forth a uniform rule with broad applications to all securities cases." *Mitchell v. Texas Gulf Sulfur Co.,* 446 F.2d 90, 105 (10th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971). Moreover, the flexibility of our case-by-case approach is well-suited to the catch-all nature of § 10(b) and Rule 10b–5. *See Myzel v. Fields, supra* at 748–49; Cobine, *supra* at 652;

Note, *Rule 10b–5 Damages: The Runaway Development of a Common Law Remedy,* 28 U.Fla.L.Rev. 76, 77–78 (1975); Comment, *Measurement of Damages in Private Actions Under Rule 10b–5,* 1968 Wash.U.L.Q. 165, 175.

2. The fact that plaintiff apparently retained most of the bonds he bought from defendants is not fatal here, as it would be in a case of strict rescission, since allowance has been made against the refunded purchase price for the value of the bonds in plaintiff's hands. *See Green v. Occidental Petroleum Corp., supra* at 1343.

3. Defendants do not challenge the inclusion of commissions as an element of plaintiff's damages. *See Madigan, Inc. v. Goodman,* 498 F.2d 233, 239 (7th Cir. 1974). Consequently, we do not address the question of whether *vel non* the recovery of commissions is appropriate where the object of the fraud is retained by the injured party.

and since the jury was instructed not to award damages for the period after plaintiff had actual or constructive notice of the fraud, it is apparent that the jury believed that he did not have such notice prior to August of 1974.

Defendants argue that plaintiff should have discovered the fraud no later than May 30, 1973, since by that date the value of his bonds had declined more than one percent. Defendants maintain that their liability should be limited to losses accrued as of that date. We do not find this argument compelling.

Every opportunity for plaintiff's discovery of defendants' fraud was met by the convincing reassurances of Wright. The same factors which originally induced plaintiff's trust continued to operate in perpetuation of the fraud. Impressed by the reputation of Stifel, Nicolaus and persuaded by Wright to expect the eventual fulfillment of the bond program's promise, Garnatz did not recognize the signals that could have provided early warning. Defendants should not complain that their fraud was so successful. We hold that on these facts, the jury's apparent finding that plaintiff had neither actual nor constructive notice of the fraud until August of 1974 was reasonable and supported by the evidence.

### B. *Damages Awarded*

The district court charged the jury, in part, as follows:

> If you find in favor of the plaintiff, you shall award as damages to the plaintiff, an amount representing the difference between the real value of the securities purchased or sold at the date plaintiff discovered or should have discovered the misrepresentations and the price actually paid for the securities purchased or sold by plaintiff and such amounts that were spent that are legitimately attributable to defendant's conduct.

Defendants maintain that under this instruction, the jury could consider evidence of plaintiff's losses as of a single date only—the date of actual or constructive notice of the fraud. Thus, defendants argue that the jury could allow plaintiff to recover either his December, 1973 losses on bonds sold, or his August, 1974 losses on bonds retained, but not both. Because the amount of the verdict clearly includes all of plaintiff's bond losses prior to his notice of the fraud, defendants conclude that the jury improperly ignored the district court's charge, and that defendants' motion for a new trial was therefore erroneously denied.

■ We disagree with defendants' narrow reading of the district court's instructions. Though not a model of clarity, when taken as a whole and in light of the evidence before the jury, we believe the instructions permitted plaintiff to recover for both his December, 1973 losses on bonds sold and his August, 1974 losses on bonds retained. *See Alabama Great Southern R. Co. v. Chicago & N. W. Ry. Co.,* 493 F.2d 979, 986 (8th Cir. 1974). In any event, defendants made no effort to secure a clearer instruction by the district court. As the Supreme Court has noted:

> Appellate courts are not inclined to grant a new trial on account of an ambiguity in the charge to the jury, where it appears that the complaining party made no effort at the trial to have the matter explained.

*Spring Co. v. Edgar,* 99 U.S. 645, 659, 25 L.Ed. 487 (1878).

■ This does not appear to us to be a case where the jury was at all confused as to the damages suffered by plaintiff. Indeed, assuming *arguendo* that the district court's instruction erroneously limited plaintiff's recovery to either his December, 1973 losses or his August, 1974 losses, the jury quite properly ignored the mistake and proceeded to correctly determine plaintiff's damages. A jury's failure to follow the trial court's erroneous instructions is not a sufficient ground for a new trial if it is otherwise clear that the verdict is just. *Lazier Gas Engine Co. v. Du Bois,* 130 F. 834, 839 (3d Cir. 1904); 6A Moore's Federal Practice ¶ 59.08[4], at 59–140 (2d ed. 1974).

We have carefully reviewed defendants' other challenges regarding the damage award and find them to be without merit. We hold that the jury's verdict was supported by the evidence and that the district court did not abuse its discretion in denying defendants' motion for a new trial. *See United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 247–48, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

## IV

Defendants' final contention concerns the timeliness of plaintiff's suit. At the outset, we note that there is no federal statute of limitations applicable to § 10(b) and Rule 10b–5 actions. Rather, federal courts borrow that statute of limitations of the forum state which "best effectuates the federal policy at issue." *Vanderboom v. Sexton,* 422 F.2d 1233, 1237 (8th Cir.), *cert. denied,* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970), *quoting Charney v. Thomas,* 372 F.2d 97, 100 (6th Cir. 1967); *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

At the trial of the present case, defendants moved to dismiss the complaint on the ground that it was time-barred. The district court denied the motion in a memorandum opinion holding that the five-year Missouri statute of limitations for common law fraud applied and that plaintiff's action was timely under that statute. The choice of Missouri's common law fraud statute of limitations was a departure from the general rule in this circuit that a forum state's blue-sky statute of limitations is normally applicable to § 10(b) and Rule 10b–5 actions. *See Vanderboom v. Sexton, supra* at 1238. However, the district court held that the *Vanderboom* rule had been impliedly overruled by the Supreme Court's decision in *Ernst & Ernst v. Hochfelder, supra,* requiring scienter in § 10(b) and Rule 10b–5 actions. Defendants urge that the district court's holding in this regard was erroneous, and that the two-year Missouri statute of limitations for blue-sky violations should govern the present case.

Since we hold that plaintiff's cause of action is timely under *either* the Missouri

blue-sky or the Missouri common law fraud statute of limitations, we need not, and therefore do not, decide which of those statutes of limitations applies in post-*Ernst* § 10(b) and Rule 10b–5 actions.

It is well settled that the statute of limitations applicable to actions under the federal securities laws is tolled until such time as the fraud is, or should be, discovered. *Vanderboom, supra* at 1240. As we have seen, the jury in the present case apparently found that Garnatz discovered, or should have discovered, the fraud as of August of 1974. That finding is supported by the evidence. Plaintiff's complaint was filed in December of 1975—well within even the two-year Missouri blue-sky statute of limitations pressed by defendants. Thus, plaintiff's action was not time-barred.

## V

Our decision of this case on federal grounds relieves us of the task of reviewing plaintiff's state law claim. We thereby avoid any unnecessary decision on matters of Missouri law.

Defendants have failed to convince us that the verdict of the jury in this case was incorrect or that the district court committed any prejudicial error. Accordingly, we affirm the judgment.